Mark Stern for the government. Yes, I'm sorry. Could you keep your voice up, please? Certainly, Your Honor. Mark Stern for the government on this appeal. And I know I've got to watch my own time, but I'm going to try and say five minutes before we're done if possible. The Secretary of Agriculture in this case promulgated a rule that restricts the importation of cattle into the United States, limiting imports to cows of under 30 months of age for purposes of immediate slaughter. The Secretary promulgated that rule pursuant to a statute that provides that he may, when and if he determines it to be necessary, impose import restrictions. Now, the rule is based on scientific studies and international standards, and it addresses one central concern, which is safety. The rule explains in extraordinary detail why the Secretary believed the restrictions that he imposed were necessary, and it also explains in detail why the Secretary believed that it was not necessary to impose an absolute ban on all imports of Canadian cattle. The decision is not even asserted to depart from the governing statutory standard, which is one that is highly discretionary and sets out no criteria at all. It's clear that the Secretary did not take into account any impermissible factors. The Secretary's decision is clearly focused on what the statute wants him to look at. And the Secretary responded in 66 pages devoted solely of the Federal Register, devoted solely to responding to the more than 3,000 comments received in the course of which the Secretary responded to every argument that RCAF made. Well, you know, in a way, in a way, that's the next case, you know, for APA review. Our case today is to review the preliminary injunction. Right. I don't know to what extent we should get into the, you know, the details of the rule or the details of the record that support the rule, except to the extent we have to decide whether or not the district court committed error, right? Well, that's a different question, isn't it? No, Your Honor, it's not. I mean, a district court can't depart from appropriate standards of review and make legal mistakes and then get affirmed on appeal. Preliminary injunctions are appealable as of right. And while that doesn't mean that a plaintiff has to prove to a certainty that he's going to succeed, and may in some cases only have to demonstrate a serious question, you would at minimum need a serious legal question and you need imminent irreparable harm. So let's address those issues. And one, why has not the plaintiff raised a serious question? And why was the district court mistaken in the irreparable harm analysis? The district court is mistaken in the irreparable harm analysis because there is no, and there is, the district court, for example, says there's a very real risk to human health of opening the borders to Canadian cattle of under 30 months for purposes of immediate slaughter. There is not a single case of anyone in the United States or Canada who has ever contracted varying Creutzfeldt-Jakob disease from eating Canadian cattle of any age. The secretary's rule concludes on the basis of voluminous scientific studies that there is no measurable risk to human health that's involved at all. The district court's decision about human safety is wholly baseless, and even plaintiff does not really seriously attempt to defend it. It's clear that none of the four cases of BSE that have been diagnosed in Canada, including the one Washington State cow, would have been importable under the secretary's rule. These were all cows of seven and eight years of age. Let me ask you, does the, under the Animal Protection Act, does that give the secretary the discretion to determine the degree of health the degree of risk that the secretary is willing to tolerate? Absolutely. There are no standards. The standards is only when the secretary says the secretary may. Now, there are all kinds of, you know, risks, you know, of all kinds of imports, you know, ranging from minimal to very great. The statute doesn't tell the secretary that any time there's a risk, I mean, first of all, it's phrased in terms of may, which is, of course, in the Supreme Court, repeatedly recognized, really is about as broad a grant of discretion as you can get. There are no standards. This isn't a statute that says the secretary shall determine with reference to, and then it lays out a series of factors. This is something that is vested. This is a mechanism. The district court was concerned that the secretary's prior regulation had been, there had been a complete ban, and the district court, as I understood it, one of its concerns was that there was not an adequate explanation for the deviation. Well, that's what the district court said. So what do we do with that? Well, I think that there are a couple of things. First of all, it's clearly wrong. I mean, it's, you know, we have to go a long way to find a regulation that has this level of specificity and detail in it. But also the district court's ruling in that regard was premised on a legal error, because the district court said, you know, you used to have a total ban. Now you don't. So looking to the Supreme Court's decision in motor vehicle manufacturing, the district court says, well, that means that your new rule is inherently suspect, and it puts you in a position where you basically have to prove to me something, you know, so that I get to decide if what you're doing is right. The district court seemed to want sort of zero tolerance. That's exactly right. Now, so if I'm understanding your argument correctly, what you're saying is that with the science that's available, and the deference that an agency is entitled to in terms of reviewing the science and determining what's an acceptable risk, that in promulgating the regulation and going through the process, the district court, that the agency doesn't have to say why we're not doing a zero risk. They just have to justify the science that they're relying on. That's exactly right, Your Honor. And, in fact, the secretary in the course of the rulemaking talks about zero risk and points out that it administers many food safety programs, and that if you had to apply a zero risk standard, effectively all of those programs would just come to a halt because good science just won't let you make those determinations. So the district court criticizes the secretary for using words like low or minimal as if these were sort of weasel words. On the contrary, what those are are very safe words of the kinds that scientists use. Do they have numbers that are beneath them? Absolutely. I mean, there are no end of relevant numbers in this history, including we've got to Well, you're obviously arguing for a lot of deference. Would there be a point where, I mean, obviously if it's arbitrary or capricious, there could be if the rule said that 96% or, you know, It might in relation to taking the original rule and then an explanation that said, well, I'm not worried because it's 96% because I believe that, you know, it's going to be 96% likely, you know, that there will be an epidemic that would strike one as being arbitrary and capricious. I agree. However, what we have is exactly the opposite. I mean, we've got studies in here, scientific studies from independent sources. We've got the original Harvard-Tuskegee study, and then we've got the updated Harvard study, the Cone Memorandum, that in fact responds to our cast expert, Dr. Cox, who put in comments, we've got about 20 or 30 pages in our excerpts of record. It's about 30 pages. It goes through point by point explaining why these statements are just inaccurate. And he explains, among other things, you sort of take, I mean, the risk assessment assumes that everything goes wrong, right? So that the secretary is, you know, that there's lots of reasons to believe that this rule would not let in any cow with any infectivity. But the rule assumes that's not the case. It assumes that cows with infectivity will come in, right? The cow comes in. It's got infectivity.  The infectivity is concentrated in the part of the small intestine called the distal ilium. Everyone agrees on that, I think. But that has to be removed. So that shouldn't be a problem. The study assumes it will be a problem. There's a feed ban, right? So none of this should get into the feed no matter what. The study assumes, no, there will be. It will get into the feed. So we've got a series of interlocking sort of measures, all of which are assumed to have broken down. And at that point, the study tells you that even under the worst case scenario, they take a whole range. You know, there's some sort of, I think by one of the articles that was referenced by one of the parties, that the agency really has not been very effective, or essentially that the people that are doing the checking are not doing that efficiently. What is there in the record about that, and how should that be considered a factor? I think that, I mean, it's a good point. It's sort of like you can have, let's say if the record said we have all of these safeguards, but then let's say the record had a showing that in the last several years that the people that are charged with administering it don't have enough people to do it, never do it, you know, are ineffective in doing it, and all of that. Would that be something? Well, first of all, the record does, I can't remember the exact citation, it does in fact talk about FDA's effectiveness, which even those GAO studies recognize as getting progressively better. But the point is that the risk assessment assumes that you've got, so it tells you if you've got misbranding, sort of, you know, so you've got a problem at, say, a 7.5% level, right, it's pretty high, it tells you there is no risk of the spread, you know, of coming in if you've got that level. And then it makes assumptions about much higher. Let's assume it's 15%. I mean, it's assuming that everybody has fallen down on the job, that the FDA has fallen down on the job, that the slaughterhouse has fallen down on the job, that the Canadian cattle dies have fallen down on the job, that everybody has messed up. And so it tells you, you know, we're looking at that. And those are the real risk assessments that are in the record, you know, and they, you know, and this is good science. You know, what we have on the other side is speculation with no foundation. It's not, the secretary has no interest whatsoever in seeing, like, a infestation in American livestock. And this is a record that sort of is replete with double checks at every point to make sure that it doesn't happen. So then the question becomes, all right, it suggests that this is a preliminary injunction. What's the harm of letting it go on, even though it doesn't seem to have, you know, much, you know, ground? Why don't we wait to see what happens next? Well, first of all, it's an APA case. Nothing is supposed to happen from now on. You do APA cases on the basis of the administrative record. And the view that no one is being harmed is flat-out wrong. First of all, the United States is in a position. Well, obviously, a lot of people have an interest in it. We have a full courtroom in overflow, so. No, that's right. And notably, basically, there's one part of, you know, the cattle raisers who have one economic interest, and you've got pretty much the rest of the entire beef industry, you know, who submitted briefs one way or the other, you know, to tell you, you know, what their harm is. And in addition, and that's a very real harm, but in addition to that harm, which they lay out, I think, rather eloquently, the United States independently has a harm. We, I mean, the secretary, I'm not the district court, has to go and deal with our trading partners, and we have to deal with closed markets where people go, you know, oh, you had a case in Washington State, and now you've got another case down in Texas, which has nothing to do with Canada. You know, well, maybe we should close, as they have in response to the first case, maybe we should close our markets to you. And we would say to them, that's ridiculous. American beef is absolutely safe. American consumers have confidence in it. You shouldn't be taking a view like that, and they can look at us and they go, well, that's exactly what you're doing. You've stopped everything in its tracks. And this is ongoing on a day-to-day basis. I mean, we've got a rule that's now been stopped by our cast. Let me ask you, Mr. Fry. Sorry, Your Honor. Let me just, let me just, I want to, before your time is running out, and I want to, there's a few questions I wanted to ask you. We've been focusing on the risk assessment. But where else, from the government's perspective, did the district court get the law wrong? Well, the, I mean, the district, I mean, there are two ways, I mean, there are two things. First, the court sort of inverts the standards and says, it says, because there is a change in what you're doing. Right. And that's just totally wrong. Right. Motor Vehicle Association makes clear that's wrong. And the court says, you've got to quantify your bottom-line assessments. That's wrong. I mean, it might be one thing if there were no numbers or relevant numbers cited, so you couldn't figure out what the secretary was doing. But that doesn't mean you've got to quantify your bottom-line assessments. Then the district court goes through and he says, at each and every point, he goes, well, the Canadian feed ban, you know, he says, Canada isn't, you know, testing enough cows. I mean, it's one of the things the court says. Well, the international guidelines say you're supposed to test 300 cows. Canada in this year is testing 30,000 cows. He says, well, you know, 30,000, that's not a whole lot. Look at the United States. It's testing many more cows. Of course, the cattle population in the United States is many times that of Canada. And when you sort of do the math, it turns out that Canada and the United States are just the same. The district court repeatedly says, well, you didn't address, you know, this comment. In fact, we did address the comments. And we didn't just address them in passing, and this is all laid out in the briefs. You know, we didn't just address them in passing. We addressed them in detail. I mean, there are real, you know, there are whole scientific studies that get marshaled up in response to some of these comments. So that they're, you know, and we sort of have gone through, you know, point by point on what, you know, the district court, you know, says. But, you know, and it's wrong in each of the individual points. I mean, for instance, it says, you know, international standards tell you that if you've got a case of BSE to sort of fall within an appropriate, to allow cattle in, what you would look to is to see two cows per million diagnosed with BSE in the previous 12 months. That's the OIE standard. It's one of the many numerical standards that's actually cited by the certatory in the rulemaking. Canada, even including the two most recent, is 0.4, well below 2. The district court, following RCAF's analysis, which was addressed and rejected in the comment period itself, says, well, sort of goes, well, I'm just going to extrapolate out the Alberta population over the entire Canadian population, and I'm not going to then do it for one year, even though these are occurring over 16 months. I'm going to act as though that was just one year, and then I'm going to compare it to other countries. So you get a ridiculous figure. But it's, you know, it's just, you know, if you do a whole series of mistaken calculations, you can come up with any number. You know, but this is just dead wrong. And what we've got is a rule of momentous consequence. There is no imminent irreparable harm that flows from allowing the rule to go into place now. None. I mean, there really isn't. And the – on either side of the preliminary injunction equation, whether it's a serious legal question, whether it's the irreparable harm, it's just not there. And it really would be wrong to leave this in place for additional months. I mean, this really is having an ongoing impact for the United States in its dealings with foreign countries, as well as to most of the beef industry, other than the part that's represented by RCAF, who sort of gets an economic boom out of this. Would you like to take some time? I would. Thank you, Your Honor. Thank you. May it please the Court. My name is Russell Fry, and with me at the Council table are Clifford Edwards and Taylor Cook of Billings and William Miller of Washington, D.C. Good morning. I'm representing the Rancher's Cattleman Action Legal Fund, which is an organization of 18,000 individual cow-calf producers, dues-paying members, along with 60 affiliated organizations that represent literally thousands of members in addition. And RCAF has been working tirelessly for the last five years to make sure that the United States cattle herd and United States consumers are subject to the highest possible protections against BSE. Now, as I listened today and as I've read the briefs, there's sort of a through-the-looking-glass quality to USDA's arguments. It's as if none of the past has happened. They say there's no risk of irreparable harm. Well, I guess the area that I'm struggling with the most that I'd like you to talk about is the level of deference that an agency gets in rulemaking. And here there is clearly some conflicting science in the area. So if you could talk to me about how, given the level of deference that what you think the level of deference is that they're entitled to, and given that they're entitled to some deference, you know, how is this arbitrary and capricious? How do I get around this? Certainly, Your Honor. Let me first make the point that I believe that there were many factual findings made by the district court and that in a review of a preliminary injunction, and I think Judge Teshima was getting to this question, the question ought to be whether the district court did something that was clearly erroneous. And I don't assume that there's nothing. Well, if it misapplied the law, it's clearly erroneous. Yes, but I'm talking specifically with respect to factual findings that I'm going to describe. Well, and I guess, too, within that address, why isn't it that the district court just didn't interject its own view of what the rule should be as opposed to the other science that the agency, you know, what deference is the district court entitled to in its opinion of what the rule should be as compared to the agency? Right. And certainly if Judge Siebel had been of the view that he could substitute his view for those of the agency, that would have been clearly erroneous and would warrant overturning the preliminary injunction. But that's not the case. And he explained the standards of review correctly. And he found in many instances that what USDA has done does not – is arbitrary and capricious under the various standards the courts have applied. For example – Let's try it. But, see, those findings are based, as Judge Callahan says, on this, you know, on the district court's acceptance, let's say, of the expert opinions of RCAF and its rejection of the expert opinions of the USDA. Isn't that what it comes down to? Your Honor, I don't believe that's correct. I think for the most part what the district court was responding to and describing was ways in which what USDA actually said it was doing was inconsistent with the record or inconsistent with other statements. For example, the final rule said, we conclude that it's safe to import beef from Canada from cattle that are slaughtered in Canada at over 30 months of age. And we realize there may be a few more cases in Canada, but we don't think there's any significant risk from that. Well, at the same time, Canada was discovering two more cases of BSE in Alberta, and USDA made the proper response to that, which is to suspend part of the rule, to say, hey, we need to look at this further. And Judge Siebel looked at that and recognized that that was an indication of the type of inconsistent assessments of the risk. We have the issue of the feed ban. What risk was Judge Siebel willing to, the district court willing to accept? Well, I don't think Judge Siebel expressed that, and I don't think it was his position to express that, because what he said is that USDA hasn't told me how much risk it's willing to accept, and that is a defect. Well, they said they're willing to take it if it's a minimal risk. They also said, Your Honor, that they haven't even determined what would be an acceptable number of infected cattle to result from this rule in the United States. Under the statute that they relied upon to promulgate the rule, why do they have to have a specific number to define the risk? Where do you get that in the statute? The statute, Your Honor, asks the Secretary to determine. You're right. It doesn't say so many deaths a year are appropriate. However, if you haven't decided and you acknowledge that you haven't decided how many deaths are appropriate for importing cattle from Canada, you say that in the final rule, how can you at the same time say, But we've decided that risk is acceptable? Well, they've looked at a number of factors, as Mr. Stern just went through, and then they decided in the final rule with their adjustments that they were willing to accept a minimal risk. See, there is some language in the district court opinion from which one could infer that the district court said, You know, nothing less than zero risk should be tolerated. I mean, that's the district court's view. But I don't know if the statute is certain. The statute doesn't say that in so many words and doesn't invest the Secretary of Agriculture with a certain amount of discretion, right, as to whether or not to impose restrictions and to what extent. And I don't think this concept of, you know, one, having to quantify the amount of risk in order to say, Well, you know, to say something is low or very low or minimal is not good enough for me. You know, requiring the Secretary to quantify what that low risk means, it really is just, you know, disagreeing with the Secretary's interpretation of the administrative record. Your Honor, you made several points there, and I agree with most of them, actually. I do not agree that the district court believed or indicated they believed that zero risk was acceptable. What Siebel said, pages 9 and 10 of the opinion, are that USDA failed to articulate any standards by which it's judged the risks of these potentially fatal outcomes to be acceptable and that it needs to provide some explanation of that acceptability. The problem with this whole rulemaking is that the government doesn't have enough information to determine what the risk is, and yet, because of economic factors, has decided, and Judge Siebel made a factual finding to this effect as well, is that the evidence before him at the time suggested, appeared to indicate that USDA made a policy decision, we need to reopen the borders to Canadian cattle, and there are statements by the Secretary of Agriculture and other officials saying that, before they completed the risk assessment, and then they worked backwards and said, We conclude that the risk is acceptable without telling the public or this court whether that means we're going to have hundreds of additional cases of BSE in U.S. cattle or in cattle located in the United States as a result of these import... Well, there were some numbers about the science that were included, right? Oh, certainly. I mean... I mean, your numbers... I mean, I read the record in terms of that you gave some numbers that the district judge accepted and rejected the numbers that they had relied on to come to their conclusion. Respectfully, Your Honor, I think that's an oversimplification. Certainly, there are a lot of numbers in the record. There are a lot of numbers thrown around in the briefs and discussed at the preliminary injunction hearing. But there are fundamental flaws in USDA's approach. And what we showed, and what Judge Siebel found there was at least a possibility of us succeeding on the merits trial, was that USDA had stated conclusions that were inconsistent with the record, inconsistent with numbers in the record. For example, they say the removal of SRMs virtually eliminates the risk, the removal of the brain and so forth. But if you look at the document on which they rely, Dr. Engeljohn's declaration, it says we've concluded that we think there's at least 80 percent effectiveness from this SRM removal. Well, that's not eliminating the risk, and that's just one example. So you want to eliminate all risk? No, Your Honor, but I think if one out of five... How about if they said they eliminated 90 percent of the risk, 10 percent? I don't think the American public would believe that 10 percent risk of a disease that has decimated the U.S. export market in terms of cattle and that is invariably fatal in terms of... Well, removal of SRM is only one of the factors in which the agency relied, which the Secretary relied upon. That's correct. And there are similar factual findings by Judge Siebel that RCAF provided information, argument that there's at least a possibility of success on many, if not all, of those additional factors. And Mr. Stern said something that's flat out wrong, and I just want to correct that, and that is that the risk assessment, he said, you know, even if it's 15 percent or more failure rate in these protections, it's still okay. Well, actually, what the Harvard Risk Assessment says is if there's 15 percent failure rate, then the... it's called the RO, but the likelihood that the disease will replicate itself and will increase in the United States is one, that it will happen. So this is just one of many examples, and this Court cannot, I think, at a preliminary injunction stage attempt to try the case on merits, and neither should a district court be expected to do so. What Judge Siebel did was look at the extensive record and filings before him, conclude that there was a showing that had been made that in many cases what USDA had asserted as the basis for its rule was not supported in the record, there were inconsistent statements in the record, there were inconsistent statements in the preamble that explained the rule, and that on that basis the criteria for preliminary injunction had been met. I think it's important to remember we had one case of BSE in this state imported from... This is not just RCAP's protectionist agenda, and we shouldn't trivialize it that way. This is a serious worldwide issue. The World Health Organization and others have warned the world not to take this trivially. We have a long history in the United States of saying that the best thing to preclude BSE in the United States is to prevent importation of infected cattle and infected feed. Now, USDA says, well, yes, that has been our policy for a long time. Apparently, from what we just heard under the Motor Vehicle Association case, they don't even have to explain why they departed from that, but I don't think that's true. But they certainly haven't given an adequate explanation. What they've said is, yes, that was our policy, and as recently as 2003, that's what they told Congress in their report to Congress, is this is the most important factor. But now we've changed. Well, that's because science has evolved. Well, what's changed? What's changed? The information that they talk about the effectiveness of the SRM removal based on where the infectivity is in the cow at different stages of the disease. Well, I guess I need to, I hear everything that you're saying, but I need to know what does deference look like to you in the sense that they are the agency that we've charged with being concerned both about our animals and our people, and they are entitled to some deference, and they are entitled, and it's their whole job to keep up with the science to make these decisions. What deference are they entitled to? Because everything that you're saying is, well, no, they can't say the science has changed. They can't say this. They can't say that. Yes. First of all, the district court made a factual finding, in which this court's opinion overturned, but it was clearly erroneous, that the fact strongly suggests that USDA, ignoring the statutory mandate to protect health and welfare of the people of the United States. You need to keep your voice up. We can't hear you. I'm sorry. That the USDA, ignoring its statutory mandate to protect health and welfare of the people of the United States, established its goal of reopening the border and thereafter attempted to work backwards to support and justify this goal. And that that is an indication that the action was arbitrary and capricious. So that's one factual finding. But in addition, the case law is very clear, and this court's decisions in, for example, the Arizona Cattle Growers Association case and others, have said if the explanation is inconsistent with the facts, if what USDA said doesn't match up with what's in its risk assessment, you know, for example, they keep saying, well, you know, we got Harvard to tell us that this is all safe. Well, you look at the Harvard risk assessment. It says we don't know enough about the prevalence of BSE to determine what the likelihood is of infection as a result of importing cattle from Canada. That's exactly what RCAP has been saying. So when your public statements and your statements in support of the rule are inconsistent with the record, then no deference, that's what the case law says, no deference is appropriate. And that's what Judge Siebel found. And, again, I submit that those decisions are ones that this court should not lightly overturn on a review of a preliminary injunction. And I'd just like to point out that, Judge Paez, there was a case, Rucker v. Davis, that you participated in that made that very point. We will not second-guess whether the court correctly applied the law to the facts of the case. And I don't agree that Judge Siebel said there was minimal risk. There was discussion in the hearing, as reflected in the transcript, where USDA said, well, we can't have zero risk. And he recognized that. But what he said is there's been a longstanding policy. It's been changed. There's no explanation of that change because the reasons what I meant to say, wanted to say a minute ago, is the things that have changed that they say are changed, new science, if you look at their citations, their studies that were done in the 1990s, they were reaffirmed by the European Union Scientific Committee in 2001. But since that time, we've still been adding additional countries to the list of countries from which we won't export beef because they had the first case of BSE, like the Netherlands in 2001. We've been telling Congress the most important protection we have is to ban imports. And yet suddenly things have changed. Well, what's changed, frankly, is it's a lot more significant decision to ban imports from Canada than it is to ban imports from the Netherlands. We don't import a lot of cattle from the Netherlands or a lot of beef. But by the same token, the significance of that decision to eliminate this longstanding policy with respect to Canadian cattle, where we have potentially millions of cattle coming into the United States with an acknowledged, quote, cluster of infectivity in Alberta, which is a, quote, high-risk region, according to USDA's counsel, that is a serious decision. RCAF, the 67 consumer and agricultural organizations that filed the MECAS brief, the six states that filed the MECAS brief, are all saying the same thing. We should not put these economic interests above the interests of protecting the U.S. cattle herd, the U.S. public, because ultimately those are the things that are in our best economic interest as well. Let me ask you, was the health – I guess the health – Animal Health Protection Act was passed in – became effective in 2002, correct? Yes, but there was a predecessor statute with similar – Similar language. Similar language. The regulation by Secretary and cooperation by the Secretary with foreign countries. Did the prior statute contain that kind of language? I'm not sure exactly, Your Honor, but I believe that there was similar language about cooperation with foreign countries because the very purpose of allowing bans on imports is to work with other countries to make sure we don't spread the disease around the world. Mr. Farrelly, let me just ask you an informational point. As far as you know, is the hearing before the district court on summary judgment still going to go ahead on the end of this month? Yes, Your Honor, July 27th. Let me make a couple of other points. Has the Secretary promulgated regulations that define the level of risk that it's willing to take or accept with respect to the American cattle herd? No, and again, what we pointed out is that what the Secretary said with respect to BSE is we haven't decided what risk is acceptable, or we haven't decided what impact is acceptable. We haven't decided whether it's acceptable for one American to die from this horrible disease or 100 or 1,000. We don't think we need to decide that because we've decided the risk is minimal or low. That's just illogical, inconsistent. It's an example of one of the many illogical and inconsistent statements in the rule. But there are regulations, or APHA's guidance, rather, that says if you don't believe you have the disease yet, then you can use these kind of qualitative risk assessments and conclude, well, we think the risk is pretty low. But if you already have the disease, then you need to do a quantitative risk assessment because that's the only way to really assess whether the risk is acceptable. That's in APHA's own regulations that we cited in our brief. USDA didn't follow its own guidance, and that's another example of arbitrary and capricious behavior. What it all leads to is the situation we find ourselves in, the situation a district court finds itself in, and the situation this court finds itself in, which is we don't know what risk it is that the Secretary of Agriculture considers to be acceptable, and therefore the district court on judicial review, the public assessing this rule, and this court doesn't have the opportunity to decide whether that risk is unacceptable. We know there have been unacceptable consequences from imports from Canada in the past, and we should not reopen the border, allow those potential unacceptable consequences, until there's been an opportunity for a full hearing pull-up. I just have one question to ask you that's a little bit different, a little off the issues we've been discussing. But how about the NEPA claim? Do these organizations have standing to maintain a NEPA claim? Yes, Your Honor, I think they do. And I think the assertion that, you know, because RCAF has taken many positions that aren't in its members' interest in connection with this very issue, BSE, advocating additional testing, advocating further SRM removal, and those costs get passed down to the cow-calf producer. So RCAF, in practice, has already indicated that it's interested not just in its members' financial well-being and what maximizes profits. I think that the – as we suggest, I think the Supreme Court in Bennett v. Speer has kind of pulled back some of the older cases that say, well, if you have an economic interest, you can't bring a claim that we haven't – the agency hasn't complied with an environmental statute, because we all have environmental interests, and the members of RCAF are the members who live in the same communities that have – that are going to be accepting cattle from Canada and feed lots and so forth. So they're subject to the impacts that would come from this rule. And so I think they do have standing to raise that claim. Okay. Thank you very much. We appreciate your argument. Thank you, Your Honor. The assertion is made repeatedly that the problem with this rule is that USDA did not say, what level of risk are we prepared to tolerate, as if that meant that there's no indication in this record of what minimal risk means. That's absolutely wrong. And regulations are not generally written from the standpoint of, well, let's start by telling you, like, how many deaths we think are okay and let's work back from there. It's like, let's look and see what the problem is, what the risk we have, and that's what the agency did. And what the risk assessments show – I mean, we've got lots of numbers on the risk assessments that tell you what it is that the agency thought was all right. And I'd just like to give the citations. There are a lot of mistaken assertions, but I want to – the original Harvard study is in the excerpts of record at 173. The second Harvard study, the Cone Gray, is in the excerpts of record at 396. Now, most of that is devoted to rebutting point by point RCAF's assertions, and the USDA's supplemental risk analysis is at 306 of the excerpts of record. I mean, this is a record that abounds in risk analysis. This isn't a case in which somebody, you know, spent 20 minutes and said, well, you know, we used to do things one way, but now we're willing to tolerate more risk. And, of course, how am I supposed to know what that means? You know, go back and do your job. You know exactly what the agency thought, and if there's some legal basis for saying that what the agency thought is wrong is a matter of law, that's one thing, but there isn't. I mean, there just absolutely isn't. And it really ultimately isn't even a question of – this isn't a close question on deference. I mean, this is one where all the stuff points the same way. I mean, a lot of the statements that are made here work their way into the district court's opinion. They're responded to in our brief, but they were also presented to the agency, so it's one of those situations where the agency – it's actually all responded to by the agency as well. I mean, for example, the statement that USDA sort of says, well, removing special risk materials, you know, sort of guarantees no risk. In the rulemaking itself, the secretary says, that's not what we said. You know, we said that that is very significant, and we said take it in conjunction with a number of things. You know, this gives us a lot of confidence. You know, but these – this has all been, you know, addressed repeatedly. And what we really have is an assertion like, well, hold off, don't do anything, we've got a hearing coming up. And this is not – again, this is an APA case. This is the record in this case, and there is real harm occurring right now. Your time is up, Mr. Stewart. Thank you so much. Thank you very much. We appreciate your argument. We're going to switch to the related case now. I'm just going to go split the time on the appeal involving the National Meat Association and the Canadian Cattlemen's Association. Your Honours, may it please the Court.
judges: Tashima, Paez, Callahan